# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01451-COA

M.C. MORRIS AND LINDA MORRIS          APPELLANTS

v.

INSIDE OUTSIDE, INC.          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/31/2014 |
| TRIAL JUDGE: | HON. MICHAEL H. WARD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM E. WHITFIELD III |
| | JOHNNY L. NELMS |
| ATTORNEY FOR APPELLEE: | VIRGIL G. GILLESPIE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | JUDGMENT ENTERED IN FAVOR OF DEFENDANT/APPELLEE |
| DISPOSITION: | AFFIRMED - 02/02/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND WILSON, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     In this contract dispute, we must decide whether the trial court erred in entering a judgment in favor of the defendant, Inside Outside Inc.

## PROCEDURAL HISTORY

¶2.     M.C. and Linda Morris filed a breach-of-contract suit in the Harrison County Circuit Court against Inside Outside (IO). The Morrises alleged they withdrew their acceptance of cabinets they had ordered. The Morrises also generally claimed breach of express warranties and breach of the implied warranties of merchantability and fitness for a particular purpose.

After a bench trial, the trial court entered a judgment in favor of IO and dismissed the Morrises' complaint. The Morrises subsequently filed a motion to alter or amend the judgment, which the trial court denied.

¶3. The Morrises now appeal, asserting numerous issues, which we have condensed as follows: the trial court erred by (1) denying their claim for breach of express warranties; (2) denying their claim for breach of the implied warranty of merchantability; (3) denying their claim for breach of the implied warranty of fitness for a particular purpose; (4) failing to award them damages; and (5) denying their motion to alter or amend the judgment.

**FACTS**

¶4. The Morrises owned a home in Gulfport, Mississippi, which received substantial damage when Hurricane Katrina struck the area on August 29, 2005. The Morrises contacted Jennifer Davis, an employee of IO, about designing and rebuilding their kitchen. In January 2006, the Morrises met again with Davis at the IO showroom to look at cabinets. M.C. testified that Davis told him and his wife that the cabinets would be solid wood, like the cabinets in the IO showroom. But Davis testified that the showroom did not contain solid wood cabinets—the cabinets on display had solid wood doors and facing, but the sides, or "box," were engineered wood. Davis stated she had given Herb Moore, the Morrises' interior decorator, a brochure indicating the cabinets were part solid wood and part engineered wood. On cross-examination, M.C. admitted that Davis told him the cabinets would not be completely solid wood, and he did not ask which parts would be solid wood or engineered wood. The Morrises also said Davis gave them finish samples, which were all

2

wood, giving them the impression that the cabinets would be entirely constructed of wood. However, the record contains photographs of two samples, both of which state these samples were only indicative of the actual finish on the cabinets.

¶5.     Ultimately, the Morrises entered into a contract with IO on January 19, 2006, to purchase kitchen cabinets for $53,733.26. Over the next months, the Morrises purchased other items from IO for their kitchen: decorative panels for $524.30; kitchen sinks for $1,407.05; and granite countertops for $8,756.27.[1] The Morrises paid $4,378.14 for the granite, with the balance due upon installation. The Morrises also paid $783.78 for handles, knobs, and other accessories.[2] Overall, the Morrises paid IO $60,826.53.

¶6.     The cabinets were delivered to a local storage facility on April 5, 2006. The record indicates the Morrises were frustrated with the length of time it took for the cabinets to arrive. The record does not indicate nor do the Morrises claim that the cabinets were promised to arrive within a certain period of time. Pam Barrineau[3] testified that Linda "had called to notify us that after some delays, the house was ready" for the cabinets.[4] The cabinets were delivered to the Morrises' residence on May 9, 2006, where they remained

---

[1] The contracts for the sink and granite indicate these items were considered special orders; thus, no refunds or exchanges were permitted.

[2] Exhibit P-29 in the record indicates that Linda received these materials on June 27, 2006. The heading states "Material Pick Up," and the description of the items states "top knobs." The signature at the bottom reads "Linda Morris."

[3] Davis left IO in mid-April 2006. Pam then became the primary contact on the Morrises' project. Pam and her husband, Tim Barrineau, owned IO.

[4] Due to health problems, Linda Morris did not testify at trial.

until June 12, 2006, when the cabinet installation began.[5] At IO's suggestion, the Morrises had hired Dan Normand to install the cabinets. When Normand and M.C. unwrapped the cabinets, M.C. was displeased with the cabinets and thought they looked like "cheap particle board."

¶7.    Although M.C. was not pleased with the cabinets, Normand continued to install them. During trial,[6] Normand testified he could not remember whether M.C. or Pam told him to continue installing the cabinets. Normand did contact Pam to inform her that M.C. was dissatisfied with the cabinets. Normand also notified Pam of several defects in the cabinets – three drawers had predrilled holes, three panel doors were cracked, two drawer facings were the wrong color, and a side panel for the microwave enclosure was missing. Pam indicated she would order replacement items from the factory and placed the order on July 14.[7] In his trial testimony, M.C. admitted that Pam never refused to address any of the problems with the cabinets. The record indicates Pam was aware of many of these defects by June 14, 2006. Pam testified she received a call from Normand on June 12, 2006, and visited the house herself on June 14, 2006, to view the cabinets.

¶8.    Normand testified that the cabinets were too tall due to an elaborate crown molding at the top, but this issue was resolved by trimming some of the toe kick off the bottom of the

---

[5] Pam testified that the installers had been delayed due to work congestion resulting from Hurricane Katrina's widespread damage. Pam testified she reiterated the reason for the delay to Linda.

[6] The Morrises filed suit on September 9, 2006, but the trial did not occur until November 13, 2013.

[7] At trial, Pam indicated IO was still in possession of these replacement items.

4

cabinets. Normand indicated that both Pam and M.C. were fine with this solution.

¶9. Pam testified that there were also issues with the corbels and another cabinet door. Pam stated the corbels were too big for the original location, but Linda decided to place them elsewhere. Pam testified she considered this issue resolved, as Linda indicated to Pam that she liked the corbels better in the new location. Pam testified she placed the order for replacement parts to cure the defects on July 14, 2006.

¶10. The cabinet door, which opened to what was referred to as the "coffee nook," could not open completely due to a strip of molding on the bottom of the cabinet housing the microwave. Pam and Tim recommended replacing the molding. Pam testified that she called Linda to have her choose a new molding. Shortly after, M.C. came to the IO offices on July 25 because he was angry with Pam for calling Linda. M.C. indicated he had previously told Pam not to call Linda with any questions about the cabinets.

¶11. M.C. was also angry because he thought the granite countertops were to be installed on July 24. M.C. had previously found a note on his door indicating the granite countertops would be installed during the week of July 24. Pam indicated that Tim was responsible for cutting the granite countertops, but he had been delayed. Tim had been cutting and honing the granite by hand since IO's granite machinery had been ruined by Hurricane Katrina.

¶12. On July 26, M.C., still angry that the purported defects in the cabinets had not been corrected, called Pam. The two argued, and Pam told M.C. she would have all his cabinets removed and money refunded. The parties contacted attorneys in order to coordinate a settlement. Initially, the agreement by M.C.'s attorney, Bill Whitfield, indicated that IO

5

would provide a full refund of the deposited funds. IO's attorney, Virgil Gillespie, then submitted a release to M.C.'s attorney incorporating this agreement. That same day, Whitfield emailed Gillespie stating the settlement had to include the $5,420.94 the Morrises paid to Normand to install the cabinets. Gillespie refused that addition to the settlement. The Morrises then attempted to revoke their acceptance of the cabinets. IO notified the Morrises that it was willing to complete its contractual obligations. The Morrises filed suit in September 2006.

¶13. The cabinets were removed from the Morrises' home in August 2007 and placed in a climate-controlled storage facility.

## STANDARD OF REVIEW

¶14. Our standard of review concerning a judgment entered after a bench trial is well settled: "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor," and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence. *City of Jackson v. Perry*, 764 So. 2d 373, 376 (¶9) (Miss. 2000). When appealing a motion to alter or amend, a party may only obtain relief upon showing: (1) "an intervening change in controlling law," (2) "availability of new evidence not previously available," or (3) "the need to correct a clear error of law or to prevent manifest injustice." *Brooks v. Roberts*, 882 So. 2d 229, 233 (¶15) (Miss. 2004). We review a trial court's denial of a Mississippi Rule of Civil Procedure 59 motion for abuse of discretion. *Id*.

## DISCUSSION

¶15.    In its ruling, the trial court determined that the Morrises were not entitled to recovery because they revoked acceptance of the cabinets before giving IO a reasonable opportunity to cure the defects.  The trial court found that the Morrises were aware of the defects no later than June 19, 2006, when the installation of the cabinets was complete.  The trial court noted that M.C. informed Pam that if all of the issues concerning the cabinets were fixed, he would disregard his dissatisfaction with the quality of wood.

¶16.    In their motion to alter or amend, the Morrises addressed whether or not they properly revoked acceptance of the cabinets.  They did not specifically address several of the issues that they now raise on appeal—namely, breach of express warranties, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and failure to award damages.  Our discussion will first focus on whether the Morrises revoked acceptance of the cabinets.

¶17.    Mississippi Code Annotated section 75-2-608 (Rev. 2002) states:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
>> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>>
>> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the

goods involved as if he had rejected them.

Thus, prior to filing suit, a buyer must provide notice to the seller of the revocation of acceptance and afford the seller a reasonable opportunity to cure the defects. *Fitzner Pontiac-Buick-Cadillac Inc. v. Smith*, 523 So. 2d 324, 328 (Miss. 1988) ("Such opportunity for cure was a reasonable requisite of [the buyer's] right of recovery."); *see also Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725, 729 (Miss. 1991). However, "[t]he seller's right to cure is not unlimited. . . . There comes a time 'when enough is enough' and a purchaser is entitled to seek revocation 'notwithstanding the seller's repeated good faith efforts.'" *Guerdon Indus. Inc. v. Gentry*, 531 So. 2d 1202, 1208 (Miss. 1988) (quoting *Rester v. Morrow*, 491 So. 2d 204, 210 (Miss. 1986)).

¶18.    In this case, the trial court determined the Morrises were aware of the defects by June 19, 2006, the date the cabinet installation was complete. In fact, the Morrises were aware of many of the defects by June 14, 2006, when Pam visited the house to inspect the cabinets and discuss the matter with M.C. and Normand. Also, Normand had notified Pam on June 12, 2006, that M.C. was unhappy with the cabinets. Pam waited until July 14, 2006, to place the order for replacement parts to cure the defects. The Morrises take issue with this delay, but Pam testified she was waiting to make sure nothing else needed to be ordered. Tim measured the kitchen for the granite countertops on or around July 19, 2006.

¶19.    As previously noted, the relationship between the parties rapidly deteriorated, such that Pam offered to remove the cabinets and return the money the Morrises had paid to IO. However, the Morrises changed their minds and asked IO to reimburse them for the

installation fee paid to Normand in addition to the money paid directly to IO. IO declined. The Morrises then attempted to revoke acceptance of the cabinets. IO maintained it was willing and able to complete its contractual obligations.

¶20.    Although Normand stated that the problems could not be fixed without altering the design, the trial court was persuaded by Pam's testimony that all the issues would be fixed. In fact, the issue concerning the corbels and the height of the cabinets was resolved to both the Morrises' and Pam's satisfaction.

¶21.    The trial court stated that it had observed M.C.'s demeanor throughout trial and noted much of M.C.'s frustration resulted from the timeliness of the project. However, the trial court found the delay was due to the effects of Hurricane Katrina and thus was not unreasonable. Ultimately, the trial court determined that IO was not given a reasonable opportunity to cure and that it heard no evidence that "enough was enough." We cannot find the trial court abused its discretion.

¶22.    The Morrises further argue that the trial court erred in denying their motion to alter or amend because it failed to address the money paid to IO for items not delivered. Specifically, the Morrises requested to be refunded $4,378.13 for the deposit on the granite and $1,407.05 for the sinks. However, the Morrises demonstrate neither (1) an intervening change in controlling law, (2) availability of new evidence not previously available, or (3) need to correct a clear error of law or to prevent manifest injustice. *Brooks*, 882 So. 2d at 233 (¶15). Since the contracts for these items state that no refund or exchange was available – only store credit – we do not find the trial court abused its discretion in denying their

motion to alter or amend the judgment.

¶23. We note that the Morrises also contend they entered into a binding settlement agreement with IO, but that IO failed to abide by its terms. Initially, Whitfield (the Morrises' attorney) emailed Gillespie (IO's attorney) that the parties had reached an agreement for IO to remove the cabinets and refund any money paid to it by the Morrises. Gillespie then sent Whitfield a release incorporating the settlement agreement. When Whitfield emailed Gillespie about including the amount paid to Normand in the settlement, Whitfield stated he "took the agreement you provided me with and made various revisions to it . . . ." Gillespie refused the revisions, and the Morrises filed suit. Thus, the parties never entered into a binding settlement agreement.

¶24. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND WILSON, JJ., CONCUR. JAMES, J., CONCURS IN PART. GREENLEE, J., NOT PARTICIPATING.**